Slip Op. 12 - 145

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | |
| Plaintiff, | |
| v. | Before: Donald C. Pogue, Chief Judge |
| UNITED STATES, | |
| Defendant, | Court No. 11-00335 |
| and | |
| HILLTOP INTERNATIONAL and OCEAN DUKE CORP., | |
| Defendant-Intervenors. | |

OPINION AND ORDER

[final results of administrative review remanded]

Dated: November 30, 2012

Andrew W. Kentz, David A. Yocis, Jordan C. Kahn, and Nathaniel Maandig Rickard, Picard Kentz & Rowe LLP, of Washington, DC, for Plaintiff Ad Hoc Shrimp Trade Action Committee.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With him on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Melissa M. Brewer, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

Mark E. Pardo and Andrew T. Schutz, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Defendant-Intervenors Hilltop International and Ocean Duke Corporation.

**Pogue, Chief Judge**: This action seeks review of four determinations by the United States Department of Commerce ("Commerce") in the fifth administrative review of the antidumping duty order on certain frozen warmwater shrimp from the People's Republic of China ("China" or the "PRC").[1] Before the court is Plaintiff's motion pursuant to USCIT Rule 56.2 for judgment on the agency record. By its motion, Plaintiff Ad Hoc Shrimp Trade Action Committee ("AHSTAC") seeks a remand to the agency for reconsideration of Commerce's I) exclusive reliance on certain data obtained from U.S. Customs and Border Protection ("Customs" or "CBP") to select respondents for individual examination in this review ("mandatory respondents"); II) selection of India as the primary surrogate country for China, which Commerce treats as a non-market economy ("NME"); III) decision to use Indian data as the exclusive source for valuing the labor factor of production ("FOP"); and IV) determination not to exclude imports from North Korea when

---

[1] See Certain Frozen Warmwater Shrimp from the People's Republic of China, 76 Fed. Reg. 51,940 (Dep't Commerce Aug. 19, 2011) (final results and partial rescission of antidumping duty administrative review), Admin. R. (Index) Pub. Doc. 7 ("Final Results") and accompanying unpublished Issues and Decision Memorandum, A-570-893, ARP 09-10 (Aug. 12, 2011), Admin. R. (Index) Pub. Doc. 4, available at http://ia.ita.doc.gov/frn/summary/PRC/2011-21259-1.pdf (last visited Nov. 29, 2012) ("I & D Mem.") (adopted in the Final Results, 76 Fed. Reg. at 51,940).

using Indian import statistics to calculate surrogate FOP

values. See Mem. of Law in Supp. of Pl. [AHSTAC]'s Rule 56.2

Mot. for J. on the Agency R., ECF No. 39 ("Pl.'s Br.").  The

court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of

the Tariff Act of 1930, as amended, 19 U.S.C. §

1516a(a)(2)(B)(iii) (2006),[2] and 28 U.S.C. § 1581(c) (2006).

As explained below, I) Commerce's mandatory respondent

selection is sustained; II) Commerce's surrogate country

selection is remanded; and III) and IV) judgment regarding

Commerce's labor valuation, as well as Commerce's decision not

to exclude data on Indian imports from North Korea when

calculating surrogate FOP values, is deferred pending Commerce's

reconsideration of its primary surrogate country selection.

## STANDARD OF REVIEW

When reviewing Commerce's antidumping decisions under

19 U.S.C. § 1516a(a)(2), this Court sustains Commerce's

determinations, findings, or conclusions unless they are

"unsupported by substantial evidence on the record, or otherwise

not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence review analyzes whether the challenged

---

[2] Further citations to the Tariff Act of 1930, as amended,
are to the relevant provisions of Title 19 of the U.S. Code,
2006 edition.

determination, finding, or conclusion is reasonable given the
record as a whole. Nippon Steel Corp. v. United States, 458 F.3d
1345, 1351 (Fed. Cir. 2006).

## DISCUSSION

I.  Respondent Selection

        AHSTAC first challenges Commerce's selection of the
mandatory respondent in this review, Hilltop International
("Hilltop"). Pl.'s Br. at 38-40.  Commerce selected Hilltop for
mandatory individual examination because, based on entry data
obtained from Customs, Hilltop was the largest Chinese exporter
of the subject merchandise, by volume, during the period of
review ("POR").[3] Certain Frozen Warmwater Shrimp from the
People's Republic of China, 76 Fed. Reg. 8,338, 8,338 (Dep't
Commerce Feb. 14, 2011) (preliminary results and preliminary
partial rescission of fifth antidumping duty administrative
review), Admin. R. Pub. Doc. 97 ("Preliminary Results").[4]

_____

    [3] The POR for this fifth administrative review was
February 1, 2009, through January 31, 2010. Final Results,
76 Fed. Reg. at 51,940.

    [4] See 19 U.S.C. § 1677f-1(c)(2)(B) ("If it is not
practicable to make individual weighted average dumping margin
determinations . . . because of the large number of exporters or
producers involved in the investigation or review, [Commerce]
may determine the weighted average dumping margins for a
reasonable number of exporters or producers by limiting its
examination to . . . exporters and producers accounting for the
                                        (footnote continued)

AHSTAC argues that Commerce's selection was not supported by substantial evidence because, in the course of a prior review of this antidumping duty order, Commerce discovered that some entries of subject merchandise had been misclassified by their importer as merchandise not covered by the order.[5] See Pl.'s Br. at 39.  As this misclassification was not detected by Customs, CBP import data for that prior review period inaccurately reported entry volumes of subject merchandise. AHSTAC contends that Commerce should have inferred from this pre-POR discovery that importers similarly misclassified subject entries during the POR at issue, and therefore that the CBP entry data are unreliable for determining the actual volume of subject merchandise entered by each respondent during the POR. See id.

_____

largest volume of the subject merchandise from the exporting country that can be reasonably examined.").

[5] Entries are designated by the importer, under penalty of the law for fraud and/or negligence, 19 U.S.C. § 1592, with a two-digit code. See U.S. Customs & Border Prot., Dep't of Homeland Sec., CBP Form 7501 Instructions 1 (July 24, 2012), available at http://forms.cbp.gov/pdf/7501_instructions.pdf (last visited Nov. 29, 2012). "The first digit of the code identifies the general category of the entry (i.e., consumption = 0, informal = 1, warehouse = 2).  The second digit further defines the specific processing type within the entry category." Id.  Consumption entries covered by an antidumping duty order must be designated as type 03, whereas consumption entries that are free and dutiable are designated as type 01. Id.

This Court has previously held that, "[i]n the absence of evidence in the record that the CBP data – *for merchandise entered during the relevant POR* and subject to the [antidumping] duty order at issue – are in some way inaccurate or distortive, the agency [may] reasonably conclude[] that such data, collected in the regular course of business under penalty of law for fraud and/or negligence, presents reliably accurate information." Pakfood Pub. Co. v. United States, __ CIT __, 753 F. Supp. 2d 1334, 1345 (2011) (emphasis added, footnote and citations omitted). Nonetheless, AHSTAC contends that misclassification of a respondent's entries during the period of the third review constitutes evidence that Customs data for entries made during the period of the fifth review is inaccurate. Pl.'s Br. at 39.

This precise issue was already decided in Ad Hoc Shrimp Trade Action Comm. v. United States, __ CIT __, 828 F. Supp. 2d 1345, 1351 (2012). That decision concluded that Commerce adequately considered the effect of the misclassification, in the third review, on the quality of the data used in subsequent reviews of this antidumping duty order. Id. Specifically, in the fourth review, Commerce verified that misclassifications identified during the third review – the very same misclassifications that form the sole evidentiary basis for AHSTAC's present argument, Pl.'s Br. at 39 – were no longer continuing. Ad Hoc Shrimp Trade Action Comm., __ CIT at __,

828 F. Supp. 2d at 1351.  Commerce thus reasonably resolved any

question arising from these misclassifications regarding the

continued accuracy of CBP entry volume data for respondents

subject to this antidumping duty order. Id.

        Because AHSTAC presents no new evidence to impugn the

accuracy of Customs entry volume data for the POR at issue here,

see Pl.'s Br. at 39, Commerce reasonably concluded that these

data were reliable for purposes of mandatory respondent

selection in this review. See Pakfood, __ CIT at __,

753 F. Supp. 2d at 1345; Ad Hoc Shrimp Trade Action Comm., __

CIT at __, 828 F. Supp. 2d at 1351.  Thus, as AHSTAC presents no

further basis on which to challenge Commerce's mandatory

respondent selection, see Pl.'s Br. at 38-40, Commerce's

determination in this regard is sustained.

    II.  Surrogate Country Selection

      A. *Background*

        With regard to the selection of surrogate market

economy countries in NME cases,[6] it is Commerce's policy[7] to

_____

        [6] In antidumping proceedings, Commerce generally treats
China as an NME, and did so in this case. Preliminary Results,
76 Fed. Reg. at 8,340 ("In every case conducted by the
Department involving the PRC, the PRC has been treated as an NME
country. In accordance with [19 U.S.C. § 1677(18)(C)(i)], any
determination that a foreign country is an NME country shall
remain in effect until revoked by [Commerce].  None of the
parties to this proceeding has contested such treatment.")
                                        (footnote continued)

begin the surrogate country selection process by creating a list

of potential surrogate countries whose per capita gross national

income ("GNI") falls within a range of comparability to the GNI

of the NME in question (the "potential surrogates list").

See Commerce Policy 4.1.[8]  "The surrogate countries on [this

---

(citation omitted).  When calculating dumping margins for
merchandise originating from NME-designated countries, Commerce
determines the normal value of such merchandise based on the
best available information regarding the relevant FOPs in one or
more economically comparable market economy countries that
produce comparable merchandise ("surrogate countries").
See 19 U.S.C. § 1677b(c)(1), (4); Preliminary Results, 76 Fed.
Reg. at 8,340 (explaining that Commerce calculated the normal
value of subject merchandise in this review in accordance with
19 U.S.C. § 1677b(c)).

    [7] Import Admin., U.S. Dep't Commerce, Non-Market Economy
Surrogate Country Selection Process, Policy Bulletin 04.1
(2004), available at http://ia.ita.doc.gov/policy/bull04-1.html
(last visited Nov. 29, 2012) ("Commerce Policy 4.1").

    [8] Having compiled a list of countries with GNI values
comparable to that of the NME, Commerce next identifies the
countries on that list that are producers of merchandise
comparable to the merchandise subject to the antidumping duty
order or investigation. Commerce Policy 4.1.  From this list of
economically comparable producers of comparable merchandise,
Commerce then determines which countries are *significant*
producers of such merchandise. Id.  Finally, "if more than one
country has survived the selection process to this point, the
country with the best factors data is selected as the primary
surrogate country." Id. (footnote omitted).  Commerce evaluates
relative data quality based on the data set's specificity to the
input in question, exclusivity of taxes and import duties,
contemporaneity with the period of investigation or review, and
public availability. Id.  Plaintiff does not challenge these
aspects of Commerce's surrogate country selection policy.
    The policy bulletin provides one exception to this general
sequence. Commerce Policy 4.1 ("Occasionally, there are also
cases in which it is more appropriate for the team to address
                                    (footnote continued)

potential surrogates] list are not ranked and [are] considered equivalent in terms of economic comparability." Id. (noting that this practice "reflects in large part the fact that the statute does not require [Commerce] to use a surrogate country that is at a level of economic development *most* comparable to the NME country") (emphasis in original).

Applying this policy in the administrative review at issue here, Commerce compiled a potential surrogates list of six countries (India, the Philippines, Indonesia, Thailand, Ukraine, and Peru). Selection of Surrogate Country, A-570-893, ARP 09-10 (July 20, 2010), Admin. R. Pub. Doc. 56 ("Surrogate Country Mem."). Commerce then, without further explanation, "determined [the countries on this list] to be at a level of economic development comparable to the PRC in terms of per capita [GNI]." Id. The relevant per capita GNI values, whose accuracy is not

---

economic comparability only *after* the significant producer of comparable merchandise requirement is met. Cases where particular emphasis on 'significant producer of comparable merchandise' is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production), e.g., crawfish, which is produced by only a few countries.") (emphasis in original, citation omitted). No party argues that this exception describes circumstances similar to the record here, so this aspect of Commerce's policy is not at issue.

in dispute,[9] were as follows:

|             |         |
|-------------|---------|
| China:      | $2,940  |
| India:      | $1,070  |
| Philippines:| $1,890  |
| Indonesia:  | $2,010  |
| Thailand:   | $2,840  |
| Ukraine:    | $3,210  |
| Peru:       | $3,990  |

Id. at Attach. I.

Commerce acknowledged that India "is not as close [in terms of GNI] to China as the other [potential] surrogate countries in the list" and noted that "the disparity in per capita GNI between India and China has consistently grown in recent years." Id. Nevertheless, Commerce determined to include India on the potential surrogate list. Id.[10]

After receiving comments from interested parties,[11] Commerce preliminarily selected India as the primary surrogate country for China in this review, "because India is at a comparable level of economic development . . . , is a

_____

[9] Commerce relied on data obtained from the World Bank's World Development Report (2010), which reports data from 2008. Surrogate Country Mem. Attach. I.

[10] Commerce noted, however, that should the disparity in per capita GNI between India and China continue to grow, Commerce "may determine in the future that the two countries are no longer 'at a comparable level of economic development' within the meaning of the statute." Id.

[11] See Preliminary Results, 76 Fed. Reg. at 8,339.

Case 1:11-cv-00335-DCP   Document 67   Filed 11/30/12   Page 11 of 23

Court No. 11-00335                                    Page 11

significant producer of comparable merchandise, . . . has
publicly available and reliable data[,] . . . [and] has been the
primary surrogate country in past segments." Preliminary
Results, 76 Fed. Reg. at 8,342 (citing Mem. Re Surrogate Factor
Valuations for the Preliminary Results, A-570-893, ARP 09-10
(Feb. 7, 2011), Admin. R. Pub. Doc. 93 (discussing Indian data
sources without comparing India to other countries)).

        In its case brief to the agency, AHSTAC argued that,
for the final results of this review, Commerce should choose
Thailand, rather than India, as the primary surrogate country.
AHSTAC Case Br., A-570-893, ARP 09-10 (Mar. 28, 2011), Admin. R.
Pub. Doc. 109 ("AHSTAC Case Br.") at 1-13.  AHSTAC maintained
that "(1) the record contains publicly available and reliable
surrogate value data for Thailand that is at least as
comprehensive, if not more comprehensive, than that for India,
while (2) Thailand is at a much closer level of economic
development to the PRC than is India, and (3) is an even more
significant producer of comparable merchandise." Id. at 2;
see also id. at 13 ("Given th[e] wide disparity in economic
comparability – and the largely minor differences in the quality
of the factor data available for India and Thailand – the only
rational choice for [Commerce] is to select Thailand rather than
India as the surrogate country for the final results.").

After considering AHSTAC's claim, Commerce continued to use India as the primary surrogate country. See Final Results, 76 Fed. Reg. at 51,940 (listing no changes to surrogate country selection from the Preliminary Results); I & D Mem. cmt. 2 at 10.

AHSTAC now argues that Commerce's selection of India as the primary surrogate country for China in this review was not supported by a reasonable reading of the record. Pl.'s Br. at 10-18.  Commerce responds that the court should decline to consider this argument because AHSTAC failed to exhaust its administrative remedies. Def.'s [2d] Corrected Resp. in Opp'n to Pl.'s Mot. for J. upon the Agency R., ECF Nos. 59 (confidential) and 62 (public) ("Def.'s Br.") at 18.  In the alternative, Defendant asserts that a reasonable reading of the record supports Commerce's decision. Id. at 22-26.  Each issue will be considered in turn.

B. *Exhaustion of Administrative Remedies*

In actions challenging antidumping determinations, "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d) (2006).  Generally, a party sufficiently exhausts its administrative remedies regarding a challenge to an antidumping proceeding if that party participates in the proceeding and presents the challenge in its administrative case brief. See Ad

Hoc Shrimp Trade Action Comm. v. United States, __ CIT __,
675 F. Supp. 2d 1287, 1300 (2009) ("It is 'appropriate' for
litigants challenging antidumping actions to have exhausted
their administrative remedies by including all arguments in
their case briefs submitted to Commerce.") (quoting 28 U.S.C.
§ 2637(d)).  An argument raised in the case brief satisfies the
administrative exhaustion requirement "if it alerts the agency
to the argument with reasonable clarity and avails the agency
with an opportunity to address it." Luoyang Bearing Corp. v.
United States, 28 CIT 733, 761, 347 F. Supp. 2d 1326, 1352
(2004) (citing Hormel v. Helvering, 312 U.S. 552 (1941); Rhone
Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir.
1990)).

     Here AHSTAC argues that the record does not support
Commerce's choice of India for the primary surrogate country
because the record contains quality data from another country
that was much more economically comparable to China while also
meeting Commerce's remaining eligibility criteria. Pl.'s Br. at
12-17.  AHSTAC sufficiently alerted the agency to this argument
when AHSTAC contended, in its case brief before the agency, that
Thailand was the only rational surrogate country choice because,
out of all of the potential surrogates that satisfied Commerce's
eligibility criteria, Thailand's per capita GNI was closest to
that of China. AHSTAC Case Br. at 2, 13-14.  Because the

argument presented in AHSTAC's case brief includes the challenge

AHSTAC now seeks to have adjudicated, AHSTAC properly exhausted

its administrative remedies in this regard. See Luoyang Bearing,

28 CIT at 761, 347 F. Supp. 2d at 1352.

Moreover, Commerce explicitly addressed AHSTAC's

economic comparability argument in its Issues and Decision

Memorandum. I & D Mem. cmt. 2 at 5 (noting AHSTAC's argument

that "Thailand has a per capita [GNI] that is much closer to

that of the PRC than is India['s]") and 6-7 (addressing AHSTAC's

relative economic comparability argument but concluding that,

"consistent with [Commerce's] policy . . . , [Commerce]

continues to find that [India and Thailand] are equally

economically comparable to the PRC for purposes of [surrogate

value] calculations"). Judicial review of this issue is

therefore appropriate, because Commerce had the opportunity to

consider AHSTAC's argument, make its ruling, and state the

reasons for its decision.[12]

C. *Commerce Acted Unreasonably*

In the administrative review, Commerce defended its

primary surrogate country selection against AHSTAC's challenge

---

[12] Cf. Unemployment Comp. Comm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946) (holding that a reviewing court usurps the agency's function when it deprives the agency of "an opportunity to consider the matter, make its ruling, and state the reasons for its action")(footnote omitted).

by relying on its policy of treating all countries on the

potential surrogates list as equally economically comparable,

regardless of relative differences among them in terms of GNI

comparability to the NME in question. I & D Mem. cmt. 2 at 6-7

(relying on Commerce Policy 4.1).  Commerce defended this policy

on the ground that "the statute does not require [Commerce] to

use a surrogate country that is at a level of economic

development *most* comparable to the NME country," Commerce Policy

4.1 at n.5 (emphasis in original); see also I & D Mem. cmt. 2 at

6-7; Def.'s Br. at 22 - i.e., Commerce defended its policy on

the ground that the statute does not expressly prohibit it.

But the absence of an express statutory prohibition does

not render permissible all that is not expressly prohibited.

"Not only must an agency's decreed result be within the scope of

its lawful authority, but the process by which it reaches that

result must be logical and rational." Allentown Mack Sales &

Serv., Inc. v. NLRB, 522 U.S. 359, 374 (1998).  Without some

link to Commerce's statutory authority and the particular

evidence in this case, an explanation that amounts to "we did it

because it is our policy to do so" is not an explanation that "a

reasonable mind might accept as adequate to support a

conclusion." Cf. Consol. Edison Co. v. NLRB, 305 U.S. 197, 229

(1938) (defining "substantial evidence").  A policy that, though

not expressly prohibited, is nevertheless unreasonable, cannot
serve as a basis for Commerce's reasoned decision-making.

Commerce's policy of disregarding relative GNI
differences among potential surrogates for whom quality data is
available and who are significant producers of comparable
merchandise is not reasonable, because it arbitrarily discounts
the value of economic comparability relative to the remaining
eligibility criteria (i.e., significant production of comparable
merchandise and quality of data).  While it is true, as Commerce
emphasizes, that the most economically comparable country would
not be a reasonable surrogate choice if the dataset from that
country was inadequate, Commerce Policy 4.1; Def.'s Br. at 22,
this is equally true of the remaining criteria.  Thus, for
example, the most economically comparable country would be an
unreasonable surrogate choice if it were not a significant
producer of comparable merchandise,[13] and the country with the
absolute best dataset would similarly be an unreasonable
surrogate choice if it were not economically comparable to the
NME in question.[14]  Indeed, Commerce's own policy suggests that
none of the three surrogate country eligibility criteria –

---

[13] See Shandong Rongxin Imp. & Exp. Co. v. United States, __
CIT __, 774 F. Supp. 2d 1307, 1316 (2011).

[14] Cf. Dorbest Ltd. v. United States, 604 F.3d 1363, 1371-73
(Fed. Cir. 2010).

economic comparability, significant production of comparable
merchandise, and quality data – is preeminent. See Commerce
Policy 4.1 (explaining that "the relative importance that
[Commerce] attaches to each [eligibility criterion] will
necessarily vary depending on the specific facts in each case").

     Because none of Commerce's three surrogate country
eligibility criteria is preeminent, it follows that relative
strengths and weaknesses among potential surrogates must be
weighed by evaluating the extent to which the potential
surrogates satisfy each of the three criteria.  If, for example,
one potential surrogate has superior data quality and another is
closer in GNI to the NME in question, Commerce must weigh these
differences when selecting the appropriate surrogate. Amanda
Foods (Vietnam) Ltd. v. United States, __ CIT __, 647 F. Supp.
2d 1368, 1376 (2009).  An unexplained and conclusory blanket
policy of simply ignoring relative GNI comparability within a
particular range of GNI values does not amount to a reasonable
reading of the evidence in support of a surrogate selection
where more than one potential surrogate within that GNI range is
a substantial producer of comparable merchandise for which
adequate data is publicly available. See id.  Rather, in such
situations, Commerce must explain why its chosen surrogate's
superiority in one of the three eligibility criteria outweighs

another potential surrogate's superiority in one or more of the remaining criteria. Id.

The Government argues that Commerce provided the necessary explanation in this case when it stated that India was a more appropriate surrogate than Thailand, notwithstanding the relative GNI disparity, because "the Thai data were unsuitable with respect to the most critical factor of production." Def.'s Br. at 22.  But this argument mischaracterizes Commerce's decision.  Commerce did not decide that the superiority of Indian data quality outweighed the superiority of Thailand's economic comparability to the NME.  Rather, Commerce decided that it need not consider relative economic comparability, or weigh one country's strength in economic comparability against another's strength in data quality. I & D Mem. cmt. 2 at 6-7. Because Commerce has provided no reasonable explanation as to why potentially slight differences in data quality necessarily outweigh potentially large differences in economic comparability, a blanket policy of simply refusing to engage in this inquiry does not amount to reasoned decision-making.

In addition, even assuming, *arguendo*, that Commerce's decision rests on the determination that Thai data quality rendered Thailand unusable as a primary surrogate in this review, the record does not support such a conclusion.  Indeed, Commerce found that the Indian and Thai data were so similar in

quality that Commerce was unable to make a distinction between
the two countries based on the datasets' specificity to the
input in question, exclusivity of taxes and import duties,
contemporaneity with the period of investigation or review, or
public availability – i.e., based on its usual data-evaluation
standards. I & D Mem. cmt. 2 at 7.

　　　　"Because the Indian and Thai import data did not allow
[Commerce] to make a distinction between the two countries,"
Commerce compared Indian and Thai information for valuing shrimp
larvae, the critical input for producing the subject
merchandise. Id. Here again Commerce found that, as with Indian
and Thai import statistics generally, Indian and Thai
information for valuing shrimp larvae was of very similar
quality. See I & D Mem. cmt. 2 at 8. Both countries provided
relevant information that was publicly available, and "neither
source [was] definitively tax/duty-exclusive or representative
of a broad-market average." Id. The distinction between the two
countries' shrimp larvae data that Commerce focused upon was
that the Thai data were specific to black tiger shrimp, whereas
the Indian data did not specify a species. Id. Based on this
distinction, Commerce concluded that because the sole mandatory
respondent had stated that it neither produced nor sold black
tiger shrimp during the POR, the Indian shrimp larvae data were
superior (because, unlike the Thai data, they did not specify

the species of shrimp to which they pertained). <u>Id.</u>   Thus

Commerce concluded that Indian data were superior to Thai data

essentially based on a finding that a subset of the Indian data

is more vague than its counterpart within the Thai data. <u>See</u> <u>id.</u>

       Contrary to the Government's assertions, however, this

record is not so "clear" as to lead to the conclusion that this

insubstantial, if not illusory,[15] difference in data quality

necessarily outweighed the concern that India's per capita GNI

was nearly a third of China's, whereas Thailand's per capita GNI

was nearly identical thereto. <u>See</u> Def.'s Br. at 22-23.   The

conclusion that Commerce need not have weighed relative GNI

proximity against relative data quality in the course of its

surrogate selection, "because the clear difference in data

quality provide ample basis for Commerce's selection decision,"

<u>see</u> <u>id.</u>, is not supported by the record.

       Because Commerce's stated reasoning regarding the

surrogate country selection in this review does not comport with

_____

       [15] AHSTAC suggests that, although the Indian data did not
specify a shrimp species, it is highly likely that they too,
like the Thai data, pertained to black tiger shrimp. Pl.'s Br.
at 16 ("[T]he record establishes that black tiger is the main
species produced in India and that vannemai (the main species in
China) was approved for sale in India only shortly before the
POR.") (citing Ex. 4C to First Surrogate Value Submission for
[Hilltop], A-570-893, ARP 09-10 (Sept. 10, 2010), Admin. R. Pub.
Doc. 70, at 30).

a reasonable reading of the record, this issue is remanded for
further consideration.

### III. Labor Wage Rate Valuation

        Commerce's current methodology, which was applied in
this review, is to value the surrogate labor wage rate FOP using
data from the chosen primary surrogate country. I & D Mem.
cmt. 5 at 24 (citing Antidumping Methodologies in Proceedings
Involving Non-Market Economies: Valuing the Factor of
Production: Labor, 76 Fed. Reg. 36,092 (Dep't Commerce June 21,
2011)).[16]  AHSTAC appears to challenge Commerce's application of
this methodology in this review only insofar as AHSTAC disagrees
with Commerce's chosen primary surrogate, as discussed above.
See I & D Mem. cmt. 5 at 23 (describing AHSTAC's argument that
Commerce "should choose Thailand as the primary surrogate
country and value labor using Thai labor data"); Pl.'s Br. at 29
(suggesting that AHSTAC would not object to Commerce's valuing
labor using data from "another [surrogate] country that was
economically comparable to China and had non-aberrant labor
data").

---

        [16] Commerce recently changed its methodology for calculating
surrogate labor wage rate values in antidumping proceedings
involving merchandise from NME-designated countries. For a
detailed discussion of this policy change, see Camau Frozen
Seafood Processing Imp. Exp. Corp. v. United States, No. 11-
00399, 2012 WL 5519636, at *5-8 (CIT Nov. 15, 2012).

Because the challenged labor valuation is premised on
Commerce's selection of India as the primary surrogate country
in this review, and because Commerce's selection of India as the
primary surrogate is remanded for further consideration,
judgment regarding Commerce's labor valuation will be deferred
until Commerce's selection of the primary surrogate country is
finalized. Cf., e.g., Tianjin Magnesium Int'l Co. v. United
States, __ CIT __, 722 F. Supp. 2d 1322, 1340 (2010).

IV.  Use of Data on Imports into India from North Korea

        AHSTAC also challenges Commerce's determination not to
exclude data on imports into India from North Korea when
calculating surrogate FOP values in this review. Pl.'s Br.
at 35-38.  As with Commerce's surrogate labor wage rate
valuation, the determination not to exclude data on imports from
North Korea, when using Indian import statistics to calculate
surrogate FOP values, presupposes the selection of India as the
primary surrogate country. See I & D Mem. cmt. 6; see also id.
cmt. 5 at 24 (describing Commerce's general practice of valuing
all FOPs using data from the primary surrogate country); Def.'s
Br. at 38.  As with Commerce's surrogate labor wage rate
valuation, therefore, judgment regarding this issue will be
deferred until Commerce's selection of the primary surrogate

country is finalized. Cf., e.g., Tianjin Magnesium, __ CIT at

__, 722 F. Supp. 2d at 1340.


## CONCLUSION

For the reasons stated above, Commerce's Final Results, 76 Fed. Reg. 51,940, are affirmed with regard to Commerce's selection of the mandatory respondent, and remanded with regard to Commerce's selection of the primary surrogate country for this review.  Commerce shall reconsider its primary surrogate country selection and either provide additional explanation, based on a reasonable reading of the record, or make an alternative primary surrogate selection that is supported by the record.  Commerce shall have until January 29, 2013 to complete and file its remand determination.  Plaintiff and Defendant-Intervenors shall have until February 12, 2013 to file comments.  Plaintiff, Defendant, and Defendant-Intervenors shall have until February 26, 2013 to file any reply.

It is SO ORDERED.

_____/s/ Donald C. Pogue_____
Donald C. Pogue, Chief Judge

Dated: November 30, 2012
       New York, NY